**FLAKICE CORPORATION, a corporation, and York Corporation, a corporation, Plaintiffs,**

v.

**LIQUID FREEZE CORPORATION, a corporation, Defendant.**

No. 31060.

United States District Court, N. D. California, S. D.

March 23, 1955.

Naylor & Lassagne, Jas. M. Naylor,. San Francisco, Cal., Daniel L. Morris,. Harold L. Stults, Curtis, Morris & Safford, New York City, for plaintiffs.

Richard W. Seed, Seattle, Wash., Tinning & Delap, Richmond, Cal., Mellin,. Hanscom & Hursh, Oscar A. Mellin, Leroy Hanscom, Jack E. Hursh, San Francisco, Cal., for defendant.

MURPHY, District Judge.

This is a patent case involving machines for the production of arched shaped ice wafers. These wafers are produced by freezing a thin sheet of ice on a rigid rotating cylindrical drum. The cylindrical shape of the freezing surface produces the arched shape provided the ice can be removed without. splintering or scraping it off. If the bond which holds the ice sheet to the drum can be broken before the ice is. broken into splinters the ice comes off in: wafers. It is the method of removing:

the ice from the drum which is important here.

Plaintiffs assert infringement of two patents—Short patent 2,310,468, dated February 9, 1943 and Raver patent 2,-308,541, dated January 19, 1943. Both the Short and Raver patents are owned by the Flakice Corporation and licensed to the York Corporation. The defendant manufactures and sells under a license of the Lees-Lessard patent No. 2,585,020, dated February 12, 1952.

In addition to pleading non-infringement the defendant alleges that the patents are invalid. They assert (a) that the patents are not a step beyond the prior art which achieves the dignity of invention; (b) prior use; and (c) that the claims are invalid as stating a function and if interpreted to include the accused machine, then they include the machines of the prior art and are invalid.

I recognize that each claim is in reality a separate invention and that ultimately each of the problems involved will have to be solved in relation to a particular claim. However, each separate claim is an effort to spell out the same basic mechanism which is asserted to be invention. The defense of anticipation goes to the patents as a whole. Whether a particular claim is functional depends upon whether it states the asserted "invention" in terms of result rather than the particular method for accomplishing that result.

I will approach the problem in this fashion: I will briefly explore first the history of the art and the mechanical structure of both the Short and Raver patents and the accused machine. I will examine into the claimed invention and the prior art generally and then relate this to the specific claims and conclude with the question of infringement. The Short patent will be discussed first and the Raver patent secondly.

*The Small Ice Making Art*

The owner of the Short patent is the Flakice Corporation. This company is largely the work of one man—Crosby Field. Field is the holder of some 115 patents, nineteen or twenty of which are connected with the production of small ice. When Field began his experimentation in 1915 which led to the development and patenting of the Field flexible freezing cylinder ice machine, the commercial ice industry was limited to the production of large blocks of ice, 300 pounds in weight. The production of ice cubes was in its infancy. The production in large blocks had a low thermal efficiency and involved a large amount of labor and transportation cost. To cut these blocks up into small pieces (one method was to saw out ice cubes) was unsatisfactory. A method of producing small ice was needed.

Field experimented with many different type machines until he finally hit upon the flexible cylinder machine. It froze a thin sheet of ice on a flexible cylinder which rotated partially submerged in a water tank. As the ice sheet emerged from the water the cylinder was flexed and the ice broken off. This machine produced arched ice wafers but the commercial machines were large and costly. Everyone agrees that the arched wafer form of ice was advantageous over snow ice, chopped ice or block ice. The arched shape prevents recongealing. If a small commercial machine could be developed which could be installed at the place where the ice was used and would operate cheaply, a great advantage to the user would result.

Short joined the Field organization in 1924. The problem which confronted Short and the other workers in the field, was the production of arched wafers in a commercially acceptable form and manner in a machine that would be capable of producing that ice continuously and over long periods of time and which was small enough and cheap enough to interest the relatively small user.

When Short first suggested the process which finally became his patented machine, Field did not think it would work acceptably. But further development led

to the application for a patent on January 29, 1938.

The patent was licensed to the York Corporation—a large manufacturer of all types of refrigeration equipment. Raver working for the York Corporation as an engineer in their research department developed the Raver machine independent of the Short invention and applied for his patent on December 7, 1939.

No machines using the Short specifications were ever built. The York Company has manufactured and sold over 13,-000 machines patterned after the Raver patent.

The defendant is a California Company and operating under a license from Lees-Lessard has sold over 1,000 of the accused machines. This is substantially cutting into York's business and is the reason for the suit.

*The Machines*

Three machines for producing arched ice wafers are involved—(1) that disclosed by the Short invention; (2) the Raver machine; (3) the accused machine manufactured and sold by the defendant.

In common they:

(a) Freeze a thin sheet of ice on a cylinder by applying water to a constantly refrigerated cylinder. In Short and the accused machine the cylinder is vertical. In Raver it is horizontal.

Short freezes on the inside by spraying a water curtain on the inside of the cylinder.

Raver and defendant freeze on the outside—Raver by partially submerging the cylinder in water—the defendant by spraying a water curtain over the outside of the cylinder.

(b) The sheet of ice becomes progressively thicker as the refrigerating medium operates through the cylinder on a continuing water supply

(c) The progressive thickening is stopped by discontinuing the water supply.

(d) The ice is removed.

(e) The clean cylinder is again covered with the water supply, the freezing progresses, the ice sheet progressively thickens—and the cycle is continued.

The removal of the ice is the subject of the dispute. (This will be described more particularly later.)

The freezing process is accomplished in the following manner:

Short—The water supply is a tank above the vertical cylinder. Water flows through holes in the bottom of the tank. The holes are placed in the arc of a circle so that the water flows through them to the inside of the freezing cylinder. The cylinder is fixed. The tank rotates and by successive steps the water flow is stopped ahead of the removal mechanism. The removal mechanism and the water curtain progress by the same steps.

Raver—The refrigerated horizontal cylinder is partially submerged in a tank of water. About $\frac{1}{5}$ of the cylinder is out of the water. As the clean cylinder rotates in the water a continuously thickening ice sheet is frozen on it until the sheet emerges from the water. The ice is removed at the height of cylinder rotation and the clean portion of the cylinder continues on to again enter the water tank.

Defendant—The water supply is a tank above the cylinder. The water curtain flows over the outside edge of the fixed cylinder. As the removal mechanism rotates about the outside of the cylinder the water curtain is stopped both before and behind the removal mechanism, leaving such area free of the water curtain.

The Removal Mechanisms—This is the contested element. The Short patent

uses a wedge to remove the ice. The wedge is a vertical bar which is parallel to the axis of the cylinder.

A picture is worth a thousand words—so that looking from above the Short machine appears like this:

The bar is connected to a toggle arrangement so that when both the cylinder and the wedge have no rotational movement the wedge is forced gradually into the ice sheet.

This severs the ice sheet from the cylinder.

The wedge is removed—the wedge member and the water curtain rotate so that with the rotation exaggerated it appears like this:

INITIAL POSITION OF WEDGE

WEDGE ROTATED

The wedge is again inserted.

*Raver—*

The removal mechanism in Raver consists of wedges mounted helically (like a lawn mower). The freezing cylinder is positively driven to rotate. The helical wedge cutter is not power driven. As the cylinder and the attached ice sheet rotate, the helical cutter is driven due to the fact that part of the helical cutter is impinged into the ice sheet. Because of its helical shape only a part of a single wedge is in the ice sheet at any one time but the cutter rotation causes the helical wedge to progress across and into the ice sheet. The distance between the helical wedges is such that a second wedge impinges into the ice sheet before the operative wedge is removed. The freezing on the rotating cylinder and the ice removal occur continuously and at the same time but at different positions on the cylinder itself. Schematically Raver looks like this:

HELICAL CUTTER

CUTTER ROTATION

WEDGE BLADE

ICE SHEET

FREEZING CYLINDER

CYLINDER ROTATION

Pictorially the lawn mower cutter looks like this:

Defendant's Machine—The removal is accomplished by a series of about 11 wedge shaped blades mounted at even intervals on a vertical bar. The bar is parallel to the axis of the freezing cylinder. The blades extend in a horizontal direction and are normal to the freezing surface. Looking at the machine from the side, it looks like this schematically:

The blades are tangential to the surface of the cylinder. The blades and the water curtain rotate continuously around the fixed cylinder removing the ice.

478

In the figure above the blades are rotating out from the plane of the paper toward you, around the surface of the cylinder and will rotate into the plane of the paper on the other side of the cylinder. Looking from above the machine looks like this:

The defendants have used three different type blades:

but all agree that in operation and effect they are the same.

*The Short Wedging Action—*

The critical element in this case is the Short wedging principle. In the Short machine, a thin ice sheet is frozen on a rigid cylindrical surface. The wedging method involves breaking the bond between the ice sheet and the freezing surface.

It is necessary to understand not only the mechanical method of operation but also the forces which effect the ice removal. Indeed the claimed invention in Short is inextricably bound up with the removal forces.

The ice sheet depending a great deal on sub-cooling and a number of other things, has a compressive strength of the order of 600 to 900 pounds per square inch—a tensile strength of the order of 100 to 125 pounds per square inch and a shearing strength of about 100 pounds per square inch. The bonding strength is of the same order as the shearing strength. Under varying conditions these ratios hold true, even though the figures will differ. What do these figures mean? Roughly—compressive strength is the ability of a material to withstand stresses which operate against each other in a pushing direction—compression. Stress is the force per unit area normally expressed in pounds per square inch.

Tensile strength is the ability of a material to withstand stresses which operate against each other in a pulling direction—tension.

Shearing strength is the ability of a material to withstand shearing stresses.

Shearing stress is the intensity of force acting in the plane of a given area. It tends to produce a sliding action in the plane of the area considered. It can be visualized by picturing three blocks of wood glued together with force applied against them in this manner:

GLUE

There are obviously stresses created in the plane of the glue tending to make the blocks slide. The shearing stress can be computed in any given plane within the material.

Although it is not crystal clear from the testimony, I take it that the bonding strength with which we are concerned is expressed in terms of ability to withstand the equivalent of a shearing stress or the tendency to resist the sliding of the sheet over the freezing surface. We are not concerned with the forces required to pull the ice sheet bodily from the freezing surface.

Of course in actual operation, any particular portion of the ice sheet is not in pure compression, pure tension or pure shear. The forces which act on the ice sheet produce various stresses in the sheet.

Short uses a slow powerful push of the wedge in a direction perpendicular to the rigid congealing surface and the ice sheet. On a cylindrical congealing surface the direction of movement of the wedge is radial. The radial force cuts the ice sheet in much the same manner as a knife cuts bread. But this does not sever the bond. Picture cutting a piece of bread from a loaf that is glued to a table. This will give you a rough idea. After cutting, a piece will be separated from the body of the loaf but that piece will still be glued to the table. The Short wedge, due to its shape and the fact that it penetrates the ice sheet slowly in a perpendicular direction (as distinguished from a rapidly acting perpendicular force, e. g., a hammer blow, which will shatter the ice) also produces a force parallel to the plane of the bond. This force is of sufficient magnitude to break the bond without overcoming the compressive strength of the ice. Although the insertion of the wedge sets up shearing stresses throughout the body of the ice sheet, the wedge shape and its insertion in a direction perpendicular to the plane of the bond causes these shearing stresses to operate in the plane of the bond and break that bond without causing the ice sheet itself to break in shear. This results in the removal of the ice sheet from the freezing surface cleanly.

Pictorially it operates thus:

Professor Hutchinson, the defendant's expert, calls this force in the plane of the bond a compressive force. Despite the exceedingly lengthy quibble about the definition of this force, it is quite clear that the wedge sets up a shearing stress in the plane of the bond which breaks the bond.

All agree that this same wedging force is present in Raver. Although the wedge

rotates, its rotation at the same peripheral speed as the cutter produces an impingement of the ice sheet into the wedge in a radial direction. This impingement has substantially the same effect as if the radial movement of the wedge occurred while the wedge and the cylinder had no relative rotational motion. It is likewise agreed that if a rotating wedge shaped cutter operates at a peripheral speed in excess of the peripheral speed of the rotating ice sheet the Short wedging action does not take place.

The plaintiffs' experts testified that the effect of such greater peripheral speed of the cutter would be to cause the ice sheet to break in shear (a scraping action) producing fine ice particles without completely severing the bond. Schematically the effect is this:

Professor Hutchinson testified, and the demonstrations which the court witnessed showed, that if the cutter in Raver were reversed so that the receding edge (the taper) follows the rotation of the blade with a peripheral speed of the cutter some 2.3 times the peripheral speed of the cylinder—the bond is broken without breaking the ice sheet in shear.

I believe that both experts were honest and straightforward and in the field of mechanics as distinguished from the ice making art, possessed of relatively the same qualifications.

A great deal of time was spent examining the experts on this point and the briefs point up the supposed discrepancy. From my careful examination of the record I conclude that both are right,

but were testifying with slightly different conditions in mind. These rotating cutters force their way into the ice sheet. The greater relative speed of the cutter also produces a shearing stress in the ice sheet which is in the direction of rotation of both cutter and rotating cylinder and which will tend as the cutter more fully impinges into the sheet to become parallel to the plane of the bond. The speed of the cutter will produce an impact effect on the ice sheet tending to break it in shear.

If the speed and shape of the cutter is such that the cutter can impinge into the sheet sufficiently so that the stresses created by the different peripheral speed will act in the plane of the bond to sever it before the shearing stresses are of sufficient magnitude to break the ice in shear, the ice will come off in flakes. If, on the other hand, the operation is such that the shearing stresses become of sufficient magnitude to cause failure of the sheet in shear before the force caused by the relative speed of cutter and drum can act on the plane of the bond the arched flakes will not result.

This is important in evaluating the prior art.

*The Relation of the Short Patent to the Prior Art—*

Professor Hutchinson admitted that the prior art disclosed no machine in which a wedge was employed to sever the ice sheet in the fashion used in the Short invention.

The defendant contends rather that the prior art discloses the operation of blades which effect the removal of the ice sheet by exactly the same forces used by Short:

(a) A radial force created by a knife or blade impinging into the ice sheet in a radial direction to divide the border area from the sheet.

(b) A force in a direction parallel to the bond between the ice sheet and the drum.

In the prior art this is accomplished by rotation of the removal mechanism at a greater peripheral speed than the speed of the drum.

They argue that the use of a wedge to produce these two forces is old and well known to any skilled mechanic.

Defendant in its answer cited seventeen prior patents as prior art. They were not able to reduce this number during the pre-trial proceeding. At the trial the number was reduced to five: three U. S. patents—N. H. Gay, 1,931,344, filed January 13, 1932; (this will be referred to as Gay (1); N. H. Gay, 1,963,-842, filed December 4, 1929; (this will be referred to as Gay (2); Bennett, 1,-528,043, filed February 17, 1921; and two foreign patents, Mort British, No. 2763; Reineck German, No. 660494.

Although the Bennett patent was introduced in evidence, no testimony regarding it was taken, and the defendant did not assert it as prior art in its brief. It is of no value as prior art. Bennett freezes ice on a moving flexible belt. The ice is broken from the belt by passing the belt around a roller. A rotary "chopper" knocks the ice, already freed from the cylinder, into small pieces. The patent discloses nothing remotely similar to the Short patent.

Before taking up the prior art patents in detail the demonstration of machines prepared by the defendant and witnessed by the court on two separate occasions needs some treatment.

Very briefly, the demonstration involved three machines:

(1) The York horizontal cylinder machine embodying the Raver patent was modified by reversing the helical wedge so that the tapered edge followed when the blades rotated and the peripheral speed of the cutter was made about 2.3 times the peripheral speed of the cylinder.

(2) A cutter like that in the Reineck patent was substituted in the York machine. The cutter was driven by mechanical means at a greater peripheral speed (2.3 to 1) than the cylinder.

(3) The York helical blades were reversed, the cutter and the cylinder were rotated in the same direction so that the direction of the cutter blades as they

approached the ice sheet was opposite to the direction of rotation of the sheet. The flat edge of the wedge thus met the leading edge of the advancing ice sheet.

None of the demonstrations (with the possible exception of the second machine) represented any prior art machine. They do show that ice wafers can be removed by means other than the use of the Short wedging action. They do not show that the prior art patents would cleanly remove ice wafers. They do show that ice wafers can be removed by exactly the same force disclosed by Short —but applied in a different mechanical fashion. Professor Hutchinson analyzed the forces involved in the removal of ice by these machines and as to that point I accept his testimony.

But care must be exercised in evaluating the effect of these demonstrations. Knowledge after the event is always easy and problems once solved present no difficulties.[1] "Prior patents 'cannot be reconstructed in the light of the invention in suit and then used as part of the prior art' ".[2] The prior art must be evaluated by searching to see if the information contained in the patents themselves as distinguished from an after the fact reconstruction, is full and precise enough to enable a person skilled in the art to perform the process or make the machine covered by the patent sought to be anticipated.[3]

Professor Hutchinson testified that the prior art disclosed the forces created by the Short wedge. I do not think they do within the requirements of disclosure set forth above. Professor Hutchinson was an honest straightforward witness, abundantly expert in the field of refrigeration and mechanics as related to ice. He readily admitted that he had

no experience in the ice making art. He did not testify as to the state of the art but rather as to the forces involved in ice removal.

Professor Hutchinson testified that he believed that the only force that can remove ice flakes from the drum (in context cleanly, as arched wafers) is a force parallel to the plane of the bond between the ice and the freezing cylinder.

I am quite strongly persuaded that his opinion that the forces are disclosed in the prior art patents rests on the assumption that these patents will cleanly remove arched wafers (fortified by the demonstrations he had no part in preparing). From that assumed result, applying his expert knowledge of mechanics and refrigeration he believes that the prior art patents disclose the only forces which could effect that result.

The obvious difficulty with this is that the assumption on which such an analysis is based was not proved. I have grave doubts that the prior art patents (with the exception of Reineck) would cleanly remove the ice. Insofar as Professor Hutchinson testified that they would, I do not believe him. The defendant has the burden of proving anticipation. This is a heavy burden and may approach proof beyond a reasonable doubt.[4]

*The Prior Art—*

A. *Reineck (German)*

This patent is not prior art as against the Short patent because its effective (ausgegeben) date is subsequent to the date on which Short applied for his patent.[5]

In any event the patent does not disclose a wedging force.

1. See Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 447, 55 L. Ed. 527.

2. Payne Furnace & Supply Co., Inc. v. Williams-Wallace Co., 9 Cir., 1941, 117 F.2d 823, 826.

3. See Mead Johnson & Co. v. Hillman's, Inc., 7 Cir., 1943, 135 F.2d 955; Dewey

& Almy Chemical Co. v. Mimex Co., 2 Cir., 1942, 124 F.2d 986.

4. 35 U.S.C. § 282 (1952) ; See Patterson-Ballagh Corp. v. Moss, 9 Cir., 1953, 201 F.2d 402; Oxnard Canners, Inc. v. Bradley, 9 Cir., 1952, 194 F.2d 655.

5. Short applied on January 29, 1938. The ausgegeben date of Reineck is May 27, 1938. Celanese Corp. of America v. Rib-

### B. *Gay (2)*

Professor Hutchinson did not testify on direct examination regarding this patent. It appears from the briefs that the defendant places no reliance upon it. The patent uses a relatively warm water spray to break the bond between the freezing cylinder and the ice sheet. The ice is then chopped into pieces by a rotating cutter. This does not suggest the Short wedge or the forces to break the bond. It rather leads away from it.

### C. *Mort (English)*

█ A foreign patent in order to negative invention must be clear and definite as to its disclosure.[6] It "is to be measured as anticipatory not by what might have been made out of it, but by what is clearly and definitely disclosed by it".[7] Mort is an 1874 patent. It is concerned with the refrigerating problems involved in making ice. His idea was to freeze a thin layer of ice on a revolving cylinder, remove it and mass it together and combine it by regelation under pressure. The freezing in a thin sheet has a higher thermal efficiency than freezing in large blocks. His drawing discloses a cutter in this fashion:

He described the cutter as:

"A spiral cutter made after the cutter in a chaffing machine, and having several blades. This is for the removal of the ice as formed, and any other form of cutter or scraper may be substituted, but I use the one described by preference".

The shape of the blade is nowhere shown. The direction of rotation of the cutter is not clear. The experts on each side testified as to a different direction of rotation.

The cutter is positively driven.

It clearly does not disclose any wedging action. Whether ice would be removed in wafers leaving the drum clear is unlikely. At best, the disclosure is indefinite. It shows at the most a set of helical members containing some type of blade which attacks the ice sheet.

### *Gay (1)*

This patent is for a method of preparing potable water. The water is frozen on a revolving drum, removed from the cylinder and melted. The freezing process removes impurities from the water.

█ While I recognize that a prior patent need not claim the particular disclosure it is asserted to anticipate,[8] the result toward which the patent is directed has a definite relation to the definiteness with which the patentee describes his machine.

bon Narrow Fabrics, D.C.S.D.N.Y.1940, 33 F.Supp. 137, affirmed 2 Cir., 1941, 117 F.2d 481; See 2 Walker on Patents 839.

6. Seymour v. Osborne, 1870, 11 Wall. 516, 20 L.Ed. 33; Carson v. American Smelting & Refining Co., 9 Cir., 1925, 4 F.2d 463.

7. Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 1938, 98 F.2d 999, 1003.

8. Mineral-Separation North American Corp. v. Magma Copper Co., 1930, 280 U.S. 400, 50 S.Ct. 185, 74 L.Ed. 511; Simons v. Davidson Brick Co., 9 Cir., 1939, 106 F.2d 518; American Safety Table Co. v. Singer Sewing Machine Co., 3 Cir., 1938, 95 F.2d 543.

In three full printed pages of specifications Gay refers to the method of removing the ice from the drum twice:

"As the drum 21 rotates, the built-up sheet of ice is carried forward *beneath a chipping device 24 which breaks the sheet into fragments which are thrown and/or rolled down the chute 25* and form a pile above the cooling coil 16, and in melting pass downward through this coil until finally a pool of melted and purified water is collected." (Emphasis added.)

"*The ice chipped from the drum 21 by the cutter 24* forms a pile over the coil 16 and thus aids in cooling the water therein, and itself is melted * * *." (Emphasis added.)

The sixteen claims do not refer to the ice removal at all. The closest any of the claims comes to any reference is in stating what is done before and after the removal operation without referring to removal at all.

Part of claim 10 is typical:

" * * * means for passing impure water over a surface of said evaporator whereby to form pure ice from the same and to discharge therefrom water containing a higher proportion of impurity, means for employing the ice thus formed for cooling said condenser and thereby melting the ice * * *."

The diagram discloses this and at this size:

The cutter and the drum to have the same relative direction of rotation in Gay (1) as in Raver but the relaperipheral speed of the cutter is greater than that of the drum. There is no wedging action.

The only way that this would disclose the forces is to assume that the ice is not chipped off in shear but is cleanly removed as in the first demonstration.

This is not at all clear. Gay says the ice is chopped. He calls his cutter a chipping device. As it is drawn, the cutter could not rotate. The blades would hit the drum. If they are lifted to clear the drum, the blade would only slightly penetrate the ice sheet and scrape off some ice.

The first demonstration was just not this machine. The forces are not disclosed.

*Prior Use—*

The answer alleged that the Short invention was in use for more than two years prior to date of Short's application.[9] Although the point is hotly contested, I am persuaded that the defendant has proved the existence of a Hilger machine having substantially the same operation as a diagram presented in evidence. (Def.Ex.H). This machine was in existence for more than two years prior to the Short invention. It is not a prior use.

---

9. Only prior use for more than one year is now required. 35 U.S.C.A. § 102(b).

A helical cutter is used. It is driven at a greater peripheral speed than the drum. Schematically the machine looks like this:

The machine in no way approaches the Short invention. The helical cutter meets the advancing edge of the ice sheet, puts it in compression and breaks the edge of the sheet off. There is no connection whatever with the wedging principle.

*Invention—*

The prior art does not disclose the Short wedging principle. Neither does it disclose the forces which effect removal in the Short patent. Is the accomplishment of Short invention?

■ We are met at the threshold with the A & P case.[10] That case and the later cases in this Circuit [11] require that for a combination patent which is made up of *old elements*, to be valid these old elements must perform an additional and different function in the combination than they perform out of it.

There is no doubt that the Short machine is a combination of a rigid congealing surface and means to supply fluid to it to form a thin layer on that surface, combined with the wedging member to remove the ice. The rigid congealing surface and the freezing mechanism are old in the art.

Is the Short wedge an old element as that term is used in the A & P case? Wedge shaped physical elements are old. Wedges have been used to produce forces perpendicular to the direction of the wedges' motion from time immemorial. But an "old element" within the A & P case is not the mere physical element unrelated to its use in the art. In the prior art there was no wedge (functioning as a wedge as distinguished from cutters having a wedge shape but not functioning as a wedge) used to remove ice from the surface on which it was frozen. The wedge is not an old element in the art of ice removal. The A & P case does not apply.

Even if I am wrong in this, the Short wedge performs a different function— the removal of ice by penetrating the ice

10. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

11. Berkeley Pump Co. v. Jacuzzi Bros., Inc., 9 Cir., 1954, 214 F.2d 785; Kwik-set Locks v. Hillgren, 9 Cir., 1954, 210 F.2d 483; Jacuzzi Bros. v. Berkeley Pump Co., 9 Cir., 1951, 191 F.2d 632; Photochart v. Photo Patrol, 9 Cir., 1951, 189 F.2d 625.

sheet on a line normal to the surface of the ice and by developing a resultant force component in a plane parallel to the plane of the bond to break it.

The wedging principle is new and novel. Its utility is conceded. The combination produced a new and useful result: The production of arched ice flakes in a more facile and efficient way. Cf. Stearns v. Tinker & Rasor, 9 Cir., 220 F.2d 49. The wedging principle has great practical value—(a) It completely removes the ice from the freezing sursafe; (b) it operates through a greater range of variables; (c) it operates on less power and with less wear on the freezing surface and the removal mechanism resulting in longer life with uniform operation; (e) it produces a relatively uniform size of ice flakes; and (f) machines are cheaper to build, operate and maintain.

While the Short machine was not itself a commercial success—no machines were ever built—there is no small commercial machine producing arched wafers which does not use the wedging principle, (including York and defendant using Lees-Lessard).

■ Short produced a machine which filled a long felt need, which those skilled in the art had not been able to devise before him. It is true that in operation the principle is simple, but this does not detract from the invention.[12] Indeed, it has enhanced it. It is the method which in the end operates simply which is most needed and which often is the most elusive. The presence of invention is not judged by reference to the accomplishments of Rube Goldberg.

*The Claims of the Short Patent—*

This brings us to the Short claims themselves. An applicant for a patent must make "a written description" of "his invention or discovery" in "such full, clear, concise and exact terms as to enable a person skilled in the art * * * to make, construct, compound, and use the same;" and he must "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery". Former 35 U.S.C.A. § 33, now contained in 35 U.S.C.A. § 112.

The defendant contends that the Short claims are invalid as functional claims; that is, that they claim the result of the machine rather than the particular method of operation.

Much has been written about "functional" claims and indeed much of it cannot be reconciled with the rest. The idea has been expressed as language that describes the invention "in terms of what it will do rather than in terms of its own physical characteristics or its arrangement in the new combination apparatus".[13] The claims cannot use "conveniently functional language at the exact point of novelty." [14]

■ The reason behind this, and the guide post in determining whether a claim is sufficiently stated is that the claim must not extend the patent monopoly beyond the point of "invention".[15] This cannot be determined by looking at the words of the claim alone.

As a practical matter the inventor is faced with this problem. He must describe his invention and discovery in "clear, concise and exact terms". He uses great particularity in the specifications describing his machine. But this precise machine ordinarily describes a single example of his invention. The step forward, the novelty while found in the framework of that particularly described machine, is much broader. There

---

12. Patterson-Ballagh Corp. v. Moss, 9 Cir., 1953, 201 F.2d 403.

13. Halliburton Oil Well Cementing Co. v. Walker, 1946, 329 U.S. 1, 9, 67 S.Ct. 6, 10.

14. General Electric Co. v. Wabash Appliance Co., 1938, 304 U.S. 364, 58 S. Ct. 899, 82 L.Ed. 1402, 91 L.Ed. 3, quot-ed in Halliburton Oil Well, 329 U.S. at page 8, 67 S.Ct. at page 10.

15. Halliburton Oil Well Cementing Co. v. Walker, 1946, 329 U.S. 1, 12, 67 S.Ct. 6, 12, 91 L.Ed. 3; Holland Furniture Co. v. Perkins Glue Co., 1928, 277 U.S. 245, 48 S.Ct. 474, 479, 72 L.Ed. 868.

are generally many variants, well known to the art, and obvious to any skilled mechanic which will suggest themselves as substitutes for the specific details of the machine disclosed in specifications and yet incorporate and use the same step forward, the same novel operation. The claims are designed to cover these.[16]

■ The question is basically whether the claims particularly point out the "invention"—the new and novel step forward—as distinguished from claiming something other than that actually invented or claiming beyond the point of invention. This involves interpreting the language of the claims in light of the actual inventon disclosed by the machine. It is quite clear that the claims must be interpreted in light of the specifications.[17] Of course this does not mean that an advance disclosed by the specifications but not covered by the claims should be read into them.[18] Nor does it mean that if the language of the claims is unambiguous and expands the claims to invalidity, either as claiming beyond the invention or as claiming inoperative mechanism, the specification will limit the claim to save its invalidity.[19]

Basically this is a practical problem. It is not an exercise in rhetoric. The claim is not to be judged as a literary exercise, but rather whether it adequately and accurately describes the invention. When viewed in their true perspective, i. e., an effort to point out the invention or discovery contained in the machine more particularly described in the specifications—words used in claims may have a definite meaning that would be indefinite were the words viewed as standing alone.

■ Now to the claims themselves: Claim 6 provides:

"* * * and means adapted to exert a radial pressure on the frozen liquid for completely severing narrow strips of the frozen liquid from the body thereof and breaking the adherence with the freezing surface".

The words "for completely severing narrow strips, etc.," is clearly only language of result. The words "and means adapted to exert a radial pressure on the frozen liquid * * *" are broad enough to include any and all mechanical methods of exerting such pressure. Anything operating as a knife cutting into the sheet of ice would be included. This is clearly beyond the invention. The basic operative part of the Short wedge is not the radial pressure but the fact that the wedge shaped blade when impinged radially produces a force in the plane of the bond which severs the ice. The Short wedge does not operate in the manner described in this claim. Crosby Field admitted this. He would read the words "means adapted" as means to exert both a radial pressure and the means of breaking the adherence with the freezing surface. In essence, he would read the Short invention into the word "means". The claim does not say this by any stretch of the imagination. It is invalid.

Claim 9 after setting out the freezing mechanism states:

"* * * and applying to said layer a force acting on a border portion of said layer said force having

16. See Judge Learned Hand's discussion of the problem in Philip A. Hunt Co. v. Mallinckrodt Chemical Works, 2 Cir., 1949, 177 F.2d 583, 585.

17. Whiteman v. Mathews, 9 Cir., 1954, 216 F.2d 712; Payne Furnace & Supply Co. v. Williams-Wallace Co., 9 Cir., 1941, 117 F.2d 823; Himes v. Chadwick, 9 Cir., 1952, 199 F.2d 100.

18. This is a concomitant to the principle that that which is not claimed is not patented. Bailey v. Sears, Roebuck Co., 9 Cir., 1940, 115 F.2d 904.

19. Graver Tank & Mfg. Co. v. Linde Air Products Co., 1949, 336 U.S. 271, 69 S. Ct. 535, 93 L.Ed. 672; Borg-Warner Corp. v. Mall Tool Co., 7 Cir., 1955, 217 F.2d 850.

a first component acting along a narrow area in a direction normal to said layer to cut into said layer and a second component acting in a direction parallel to said layer and of a magnitude sufficient to overcome the shearing strength of the bond between said surface and said border portion without exceeding the compressive strength of said congealed substance".

The Short wedging action does this, but the claim includes any method of producing those enumerated forces. This is not the Short invention. Short uses a wedge. His invention is limited to the use of the wedge. Plaintiffs infer, although they do not say it directly, that "force" should be read wedging force. It does not say this. The claim is invalid as claiming beyond the invention.

Claims 10 and 16, after setting out the freezing mechanism state:

*Claim 10—*

" \* \* \* to form a sheet of the brittle congealed substance thereon having an edge along which a substance removing operation is carried on, and applying a wedging force along a line substantially parallel to said edge and dividing an edge portion of the sheet from the remainder of the sheet, said wedging force being effective to wedge the edge portion from the sheet and from the heat exchange member".

*Claim 16—*

" \* \* \* and means for removing successive border portions of said congealed layer comprising wedging means, means mounting said wedging means for relative movement with respect to said congealing surface, and means for causing a succession of penetrations of said wedging means into the congealed layer and upon each penetration to thereby apply force to the congealed layer near the end thereof

and along a narrow area to cut into said layer and sever the border portion from the body of the congealed layer and to apply force against the body of the border portion in a direction parallel to said congealing surface to act through the body of the border portion to break the bond between the border portion and the congealing surface to free the border portion as a body from the congealing surface without overcoming the compressive strength of said border portion".

In Claim 16 "wedging means" are described in terms of their operative effect on the ice sheet. Claim 10 is a method claim which recites the "application of a wedging force along a line substantially parallel to said edge [the edge along which the substance removing operation is carried on]". 

These claims set forth the Short invention with sufficient particularity that when viewed in context their substance and meaning can be fully appreciated. They do not go beyond the point of invention.

*Infringement of the Short Patent—*

Does the accused machine infringe the Short claims?

The problem is whether the accused machine uses substantially the same elements which function in substantially the same way to produce substantially the same result.[20]

Does the accused machine use the wedging action? It is quite clear that it does. The wedge shaped blades are tangentally placed with relation to the surface of the freezing cylinder. As the wedges progress around the ice sheet, as to any particular portion of the sheet, the wedges penetrate into the ice in a radial direction. A diagram somewhat like the frames of a motion picture will

20. Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097.

490

demonstrate this. For convenience sake
I have drawn it as if the blades remained
stationary and the ice sheet rotated. The
result is exactly the same.

The rotation causes the wedges to impinge in the ice sheet in the same manner as had they been forced in by a toggle arrangement as in Short. Lees-Lessard in their patent application recognize that the tangentical placing of the wedges causes a wedging action.

Does this wedging action destroy the bond without overcoming the compressive strength of the ice? This question was fully explored at the trial. I accept Crosby Field's explanation of the phenomenon. The freezing surface is clean after the ice removal in the accused machine. This can be true only if the bond is broken. To use the bread loaf analogy, if the bond is not broken, pieces of bread will remain glued to the table even though they are not whole slices of bread. If the compressive strength of the ice is reached before the bond is broken or if the "ice sheet is destroyed" before the bond is broken, parts of that sheet between the wedges will not be removed from the drum.

At the demonstration of the operation of the accused machine, I carefully noted the ice removal above the top wedge. The ice sheet was bodily moved in a direction perpendicular to the plane of the wedge, (here vertically). One of the plaintiffs' engineers testified that he removed the bottom blade in the defendant machine and the ice was removed in flakes. This is consistent with my observation. It results from the wedging action in the accused machine breaking the bond.

There is a difference in the accused machine and that of Short. Short tends to remove the arched wafers in a body (like a whole piece of bread). In the accused machine the ice between the wedges breaks in shear after the bond is broken. This is due to the fact that the ice sheet has no place to go and being between the wedges buckles and breaks in shear.

This is not a fundamental difference. It operates after the fact. The wedging action removes the ice and the mechanism later breaks it in shear producing smaller arched wafers.

Defendant argues that the accused machine does not employ a succession of penetrations. This is a peccadillo. The wedges may be moving continuously, but with regard to any particular portion of the ice sheet the wedges are penetrating in one portion at one time and later in another.

There are differences in the mechanical operation of the two machines. Defendant uses more than one blade. The direction of impingement of any one blade is not longitudinally to the cylinder parallel to its axis (as in Short) but rather perpendicular to the axis. The force in the plane of the bond likewise operates in a different direction. In Short due to the shape of the wedge, (that is, with the taper on the side toward that portion of the ice sheet which is discontinuous), and the fact that the ice sheet behind the wedge is rigid, produces this force only in one direction—toward the discontinuous edge of the sheet. The defendant's wedges (at least the first and third ones used) produce this wedging force in two

opposed directions because of their shape and the fact that except for a narrow portion at the top and bottom of the cylinder the ice sheet is between two wedges.

Claim 10 recites:

"an edge upon which a substance removing operation is carried on and applying a wedging force along a line substantially parallel to said edge".

Claim 16 recites:

"means for removing successive border portions"

and a force (the radial cutting force) applied

"to the congealed layer near the end thereof and along a narrow area to cut into said layer and sever the border portion"

and

"to apply force against the body of the border portion in a direction

parallel to said congealing surface to act through the body of the border portion to break the bond and free the border portion as a body".

■ Defendant argues that in determining infringement the claims must be read in light of the specification. This is certainly true.[21]

They then argue that the "edge upon which a substance removing operation is carried on" and the "border portion" can mean only the leading edge of the ice sheet. As a concomitant of this, they argue that the claims are limited to a wedging force which impinges into the ice sheet longitudinally to the axis on a line parallel to the leading edge of the ice sheet.

The plaintiffs, on the other hand, ignoring the directions in which the removal forces operate in the defendant machine, argue that a border portion is removed. The ice comes off in a vertical line extending roughly in a line passing through the mid-parts of a series of wedges. The "wedging force" is likewise applied along this line. This line is parallel to the advancing edge of the ice.

The difficulty with this last analysis is that "wedging force" become mere words. True there is a wedging force which is applied along that line. But in context "wedging force" means that the component parallel to the plane of the bond is perpendicular to the length of the wedge. The claim means that the wedge is applied parallel to the "edge" on which the substance removing operation takes place but that the component of force in the plane of the bond acts perpendicular to that "edge".

What do the claims mean?

It is true that in the Short drawing the "border portion" and the edge on which the substance removing operation take place is the leading edge of the ice sheet as it rotates. The Short invention requires action on a "border portion" or on an "edge". This is clearly envisioned. Indeed it is necessary for the wedge to work. The force produced by the wedge in the plane of the bond is limited in the distance through which it will operate. For example, a single wedge applied one foot from the edge of ice sheet in the manner described by the Short drawing would not work—neither would a series of wedges operated as in the defendant machine but placed two feet apart. The magnitude of the force in the plane of the bond would be insufficient to sever the bond. A border portion is required so that the wedging force will be effective. This is what the Short claim means.

In both Short and the accused machine ice is formed on a cylinder that presents a clean area behind the wedge and an ice sheet before the edge as the wedges progress around the circumference of the cylinder. It is this fact which beclouds the fact that there is a border portion of the ice sheet and an edge at the top of and bottom of the cylinder as well. Thinking of the ice sheet as a plane surface will, I think, clear this up. This is a valid approach because the Short claims are not limited to freezing on such a cylinder. Even though we are concerned with production of arched ice flakes, there is no substantial difference between an arched flake which is cut *across* the direction of curvature—

SHORT AND RAVER
ICE FLAKE

CUT EDGE

21. See Footnote 17.

494

and an arched flake which is cut *along* the direction of curvature—

Viewing the ice sheet as a plane it has three edges—three border portions—

I take it that clear infringement would result if a machine consisted of more than one Short wedge [22] side by side and operating together. Schematically looking from the top—

22. Schick Dry Shaver, Inc. v. Motoshaver, Inc., D.C.S.D.Cal.1937, 21 F.Supp. 722; see Pedersen v. Dundon, 9 Cir., 1915, 220 F. 309.

The middle areas are removed by wedging within the Short patent, and even under the unduly strict interpretation of the claims which the defendants assert. Nor would the result be any different if the wedge faces tapered in both directions from the line of impingement. This is exactly what the defendants have done. In a plane the above Short would look like this:

The defendants have merely turned the wedges sideways:

The top or bottom edge of the advancing ice sheet are border portions removed in exactly the same way as in the Short machine. The tangental placing of the wedges around the cylinder forces the wedges into the ice sheet as the blades rotate, just as the toggle mechanism produces impingement in Short.

The areas between the wedges are their own "border portions" and the cutting edge is the edge along which the removal operation takes place.

■ The defendant's machine is the equivalent of the Short patent and infringes both claims 10 and 16.

## The Raver Patent

Raver uses the Short wedging invention. He applies it differently—by means of a rotating helical cutter. (The cutter looks like a lawn mower). Plaintiffs concede that the Raver claims "are limited to the construction of the machine for and the method of removing the ice by means of the helical wedges". They contend that the invention lies in the fact that Raver included a new element "a series of helical wedge members which are driven entirely by their contact with and penetration into the ice as the freezing cylinder and the wedge members rotate relatively to each other".

It is true that in the machine disclosed in the Raver specifications the wedge members are driven entirely by contact with the ice. This is of great importance from the power and wear standpoint. Only one body need be driven. The accused machine employs the equivalent of this principle by moving the blades around the ice and keeping the cylinder stationary. But, be that as it may, Raver did not claim this and it is therefore dedicated to the public.

I will take up infringement first for it is more easily solved. Although the claims recite progressively moving a wedging force effective at a single point across the ice sheet, in context, this means the helical member.

■ The defendants do not employ this method of applying the wedging force. The accused machine does not infringe.

This is a slight oversimplification for certain of the Raver claims do not include the helical wedging members (claims 12, 13, 9 and 10) but only wedging. They are not, from the standpoint of removal of the ice sheet, patently distinguishable from Short, and since evidence of infringement was limited to the

method of removal, the accused machine has not been proven to infringe. In addition, claims 2, 3, 9, 10, 12, 13, 14 and 21 include in slightly different words "means to regulate the temperature of the congealed liquid to temper it" for subsequent removal. This tempering is accomplished in Raver by spraying relatively warm water on the ice sheet between the part where the sheet emerges from the water and where it is removed. This warms the ice sheet to make it hard and brittle. The accused machine employs no such step. On the contrary, the ice in passing through the water free zone prior to removal is subcooled and becomes increasingly hard and brittle.

Even though the question of validity of the claims is largely academic in view of no infringement, the tendency is to consider it anyway.

Raver is a combination of old elements:

(1) The wedging principle disclosed by Short.

(2) The helical cutter disclosed by Mort and Hilger, (helicals were used in the prior art to support the cutting edges and by rotation attack the ice sheet).

■ If the whole combination does not exceed the sum of its parts, or stated differently, if these *old elements* do not perform an additional and different function in combination than they perform out of it, the combination is not invention, however novel or useful is the result.[23]

But this is a negative thing. The negative interdiction relating to the function of the elements of the combination must be contrasted with the positive requirements patentably of the combination itself.

■ As I read A & P and the later cases in this Circuit [24] it does not follow that any combination is patentable in which old elements operate with a different function than that disclosed in the prior art. The forward step which *the combination* makes must also be in and of

---

23. Jacuzzi v. Berkeley Pump Co., 9 Cir., 1951, 191 F.2d 632.

24. See Footnotes 10 and 11.

itself patentable. The *combination* must in addition produce a new or improved *result.*[25]

There is little question that the result of the Raver combination is the production of arched flakes in a more facile, economical and commercially efficient way than that disclosed in the prior art, (including Short).

The combination in sum is a patentable invention if the function of the separate elements of the combination is different than that function disclosed in the prior art.

 While commercial success is no substitute for invention, it is relevant and strongly persuasive in a close case.[26] Raver was a resounding success.

Do the elements in the Raver combination perform a different function in the combination than they do out of it?

The wedge does not.

The helical does. A helical is a helical, just as a wheel is a wheel wherever it is. But it is the function of this helical in the art of ice removal with which we are here concerned.

The helical acts as more than a mere support for the elements which physically sever the ice sheet from the freezing surface. It allows a single point contact of the wedge with the ice sheet which progresses across the ice sheet. This results in more facile entry into the sheet itself, a saving of power due to the fact that only a small portion of the total wedge is acting at one time and (although it is not claimed as the invention) in terms of function the helical members allow the wedge cutter to be driven entirely by the contact with the rotating ice sheet.

No other helical in the prior art performed this function.

The new function of the helical members may not rise to the dignity of an invention standing alone. But that is not required. The independent function of the helical is not sought to be patented. It is the combination of this new function of the helical members with the Short wedge with the subject of the patent. The result is a step forward in the ice making art which reaches the dignity of an invention.

*The Claims Themselves—*

 Claims 1, 14, 2 and 3 embody the combination and describe it sufficiently in non-functional language. They are valid.

Claims 9, 10, 12, 13 and 21 do not embody the combination and are not a patentable step beyond the prior art. Although the emphasis on the case was not directed toward the validity of the tempering step involved in these steps, it appears to me that the tempering here performs in combination exactly the same tempering function well known in the prior art.

In sum the case comes down to this: Short produced an important step forward in the ice making art by the invention of the wedging principle. Raver and the accused machine (the Lees-Lessard patent) both apply that wedging principle embodying the Short patent but improve its application.

Let findings of fact and conclusions of law be prepared in accordance with the Rule.

The parties have stipulated that the question of damages be referred to a master. The form of order and injunction will be settled at a later time on motion of plaintiffs' attorney.

I have omitted consideration of the other patent claims not alleged to be infringed. The counterclaim asks that they be declared invalid. I desire further argument on this point. The date will be settled at the convenience of all parties involved.

25. Photochart v. Photo Patrol, 9 Cir., 1951, 189 F.2d 625; Kwikset Locks, Inc. v. Hillgren, 9 Cir., 1954, 210 F.2d 483; Oxnard Canners, Inc. v. Bradley, 9 Cir., 1952, 194 F.2d 655.

26. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973.